THIS OPINION IS A PRECEDENT
OF THE TTAB

Mailed:
March 23, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

The Black & Decker Corporation

v.

Emerson Electric Co.

———

Opposition No. 91158891
to application Serial No. 78183805
filed on November 11, 2002

Opposition No. 91158941
to application Serial No. 78197342
filed on December 23, 2002

———

William G. Pecau and Rachel M. Marmer of Steptoe & Johnson LLP for The Black & Decker Corporation.

Albert B. Deaver, Jr. of Locke Liddell & Sapp LLP for Emerson Electric Co.

———

Before Seeherman, Hairston and Mermelstein, Administrative Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

The Black & Decker Corporation has opposed the

applications of Emerson Electric Co. to register DIRT HAWG[1]

---

[1]  Application Serial No. 78183805, filed November 11, 2002, based on an asserted bona fide intent to use the mark in commerce.

and WATER HAWG[2] for "vacuum cleaners, wet and dry vacuum cleaners, and replacement parts therefor." As grounds for opposition, opposer alleges that since prior to the filing date of applicant's applications, opposer has used HOG "as a trademark for a family of power operated outdoor equipment, including power operated blower-vacuums, electric lawn mowers, power operated grass trimmers, power operated chainsaws, and power operated edgers, and as the principal distinctive element of the trademarks for each of the many products belonging to the HOG family of products, namely, the marks HEDGE HOG, EDGE HOG, GRASS HOG, LAWN HOG, LEAF HOG, and LOG HOG, and for slogan marks for that HOG family, such as HOG POWER" ¶1; that since prior to the filing date of applicant's applications, opposer has used various two word marks incorporating the word HOG as trademarks for power operated outdoor products; that opposer has used a variety of slogan marks incorporating its HOG mark, including HOG POWER, GOING HOG WILD, and IS THERE A HOG IN YOUR YARD?; that the public has come to recognize opposer's HOG product marks as a family of marks for its products; that it owns registrations for a number of marks containing the word HOG; that applicant's marks so resembles each of opposer's HOG product marks--HEDGE HOG, EDGE HOG, GRASS HOG,

---

[2] Application Serial No. 78197342, filed December 23, 2002, based on an asserted bona fide intent to use the mark in commerce.

LAWN HOG, LEAF HOG and LOG HOG--and opposer's family of HOG product marks and HOG slogan marks as to be likely, when applied to applicant's goods, to cause confusion and mistake and to deceive, in violation of Section 2(d) of the Trademark Act, 15 U.S.C. §1052(d).

In its answers, applicant has admitted that the TESS database of the USPTO shows that opposer is the owner of its pleaded registrations, but otherwise has denied the salient allegations of the notices of oppositions.

After the filing of the answers, the parties filed a consented motion to consolidate the proceedings, which was granted. Accordingly, we will decide both oppositions in this single opinion.

The record consists of the pleadings; the files of both the DIRT HAWG and WATER HAWG applications; the testimony, with exhibits, of opposer's witness, Joseph Newland, one of opposer's group project managers, and of applicant's witness, Dave E. Beth, Vice President of Engineering for one of applicant's divisions. Opposer has also made of record, by notice of reliance, status and title copies of its pleaded registrations, as set forth infra; dictionary definitions; applicant's responses to certain of opposer's interrogatories and requests for admission; and printouts from the TTAB's TTABVUE website showing an opposition brought by opposer against a third party (an official record

3

pursuant to Trademark Rule 2.122(e)). In addition, opposer has sought to make of record, by notice of reliance, printouts of certain web pages. Such matter is normally not acceptable for a notice of reliance as such web pages do not constitute printed publications under Trademark Rule 2.122(e). See Raccioppi v. Apogee Inc., 47 USPQ2d 1368 (TTAB 1998). However, at the testimony deposition of Joseph Newland applicant stipulated that it would not contest the authenticity of these web pages and, in addition, applicant has treated this material as being of record, setting forth in its brief that such materials are part of "opposer's evidence of record." Therefore, we consider applicant to have stipulated to the submission of this evidence, and have treated it as of record. The record also includes evidence submitted by applicant under a notice of reliance, consisting of printed publications, trademark registrations of opposer and of third parties,[3] and opposer's responses to certain of applicant's interrogatories and requests for admission. Opposer and applicant have filed trial briefs, and opposer filed a reply brief.[4]

---

[3] The trademark registrations of opposer were previously made of record by opposer, as was acknowledged by applicant in its notice of reliance. Applicant has submitted copies of the registrations that were printed from the USPTO's electronic records, and which show, in addition to the registration information on the status and title copies submitted by opposer, the design search codes for opposer's non-standard-character-format marks.

[4] In its brief applicant makes the comment that "it is appropriate for the Board to take notice of the number of applications and registrations in the name of [applicant]."

**Opposer's Motion to Amend the Pleadings**

On April 11, 2006, four days after the close of the trial period, opposer filed a motion to amend its notices of opposition to add an additional ground, namely, that applicant did not have a bona fide intent to use its marks on all of the goods identified in the applications at the time the applications were filed.[5]  Applicant filed a brief in opposition to this motion, and opposer filed a reply brief.  Opposer did not request that proceedings be suspended pending a decision on its motion and, notwithstanding that the Board had not ruled on the motion, opposer filed its brief on the case without contacting the Board for a telephone hearing on a motion to suspend.  Thus, both opposer and applicant have filed briefs on the case on the Section 2(d) ground of opposition, and opposer has filed a reply brief.

---

p. 5.  This is not an appropriate matter for judicial notice; the Board has stated in numerous decisions that it does not take judicial notice of registrations residing in the U.S. Patent and Trademark Office.  See In re Duofold Inc., 184 USPQ 638 (TTAB 1974).

[5]  In the proposed amended notice of opposition to registration of the mark DIRT HAWG, opposer alleges that applicant did not have a bona fide intent to use the mark for vacuum cleaners when it filed its application, that it had an intent to use the mark for only wet and dry vacuums and replacement parts therefor.  The proposed amended notice of opposition to registration of the mark WATER HAWG alleges that applicant did not have a bona fide intent to use the mark for the identified goods "vacuum cleaners, wet and dry vacuum cleaners, and replacement parts therefor" when it filed its application.

In its brief on the case, opposer has argued the merits of the ground that it seeks to add by its motion to amend. Thus, it appears that opposer believes that the motion to amend will not only be granted, but that no further discovery or testimony is required, and that no prejudice will result to applicant by our granting the motion and deciding the ground on the record that was adduced in connection with the Section 2(d) ground. To this extent, it would appear by opposer's filing of its main brief that it believes that the ground of no bona fide intent to use had been tried by the implied consent of the parties, and that we should deem the pleadings to be amended pursuant to Rule 15(b) of the Federal Rules of Civil Procedure. On the other hand, opposer has submitted an amended notice of opposition, and asserted in its motion to amend that its motion is timely, an argument that would typically be advanced in a motion to amend under Fed. R. Civ. P. 15(a).

To the extent that opposer intends its motion to be brought under Rule 15(b), the papers submitted by the parties do not persuade us that the parties knew that the issue of no bona fide intent was being tried. The subject matter of the testimony depositions essentially is concerned with evidence that relates to the du Pont factors and the ground of likelihood of confusion. In re E.I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

6

Although opposer's attorney questioned applicant's witness about applicant's plans to use the marks, much of this discussion centered on the products for which the mark would be used, and in the general context of the deposition, many of these questions could be viewed as attempts to discover whether applicant's products had similarities to opposer's goods. We also note that many of the questions asked during cross-examination were free-ranging, and cross-examination had some of the nature of a discovery deposition. The only argument of opposer's that might be construed as an assertion that the issue of intent was tried is opposer's assertion, in its reply brief, that an applicant's intent to use goes to the heart of whether an application is valid, and therefore that intent-to-use is discoverable matter.[6] We agree with opposer that information about an applicant's intent to use a mark is discoverable, but merely because a party has taken discovery on this issue does not mean that the issue has been tried.

As for treating the motion as one under Fed R. Civ. P. 15(a), this rule provides that once a responsive pleading is

---

[6] Opposer made this argument in response to applicant's claim that opposer's motion is not timely because opposer was put on notice by applicant two years earlier, during the discovery period, that discovery of applicant's intent to use its marks was outside the scope of this proceeding. Whether or not opposer was put on notice, by applicant's objections, that applicant did not consider its intent to be an issue, applicant's discovery responses do not show that applicant believed this issue was going to be tried.

served, as is the case in this proceeding, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." However, the Board does not grant such leave when entry of the proposed amendment would be prejudicial to the right of the adverse party. See TBMP §507.02 (2d ed. rev. 2004). Applicant would be prejudiced if the ground of no bona fide intent to use were to be decided on the present record; applicant has had no opportunity to present evidence on this issue to refute or explain the testimony on which opposer relies in support of this ground.[7] Thus, the only way the Board could avoid prejudice to applicant would be by reopening the trial phase of this proceeding so that applicant could submit evidence addressing this ground. However, by filing its brief on the case while its motion to amend was still pending, opposer caused the opposition to proceed to the next stage, that of briefing, as a result of which applicant filed its brief on the case. Therefore, applicant would be prejudiced whether or not the Board reopened proceedings, either by not being able to take testimony, or by having filed a main brief before the trial phase was over.

---

[7] During cross-examination applicant's witness testified that two vice presidents of marketing were primarily responsible for the intent to use the DIRT HAWG and WET HAWG trademarks, and that he did not know what plans applicant's president might have.

8

As set forth in TBMP Section 507.02(a), the timing of a motion for leave to amend under Fed. R. Civ. P. 15(a) plays a large role in the Board's determination of whether the adverse party would be prejudiced by allowance of the proposed amendment. Opposer states that it was not aware that applicant did not have a bona fide intent to use its marks on all of the goods identified in its applications until opposer cross-examined applicant's witness during applicant's testimony period. That occurred on February 27, 2006, and opposer filed its motion to amend on April 11, 2006, shortly after opposer received a copy of the transcript of that testimony deposition. However, the papers submitted in support of and in opposition to the motion to amend indicate that opposer did have information during the discovery period which should have led it to file a motion to amend, or at the very least to take further discovery to see if a "no bona fide intent" ground were tenable. Specifically, in response to Interrogatory No. 2, in which applicant was asked to identify each kind of product applicant intends to sell under the designations DIRT HAWG or WATER HAWG, applicant answered that "it currently intends to sell only wet/dry vacuums under the DIRT HAWG and WATER HAWG marks." This interrogatory response was received by opposer on August 12, 2004.

Thus, we cannot accept opposer's position that it was not apprised of a possible basis for its claim that applicant lacked the requisite intent to use until the deposition of applicant's witness, Dave E. Beth.[8]  Despite having received the discovery response indicated above in August 2004, opposer failed to move to amend the pleadings at that time, or to take further discovery to determine whether or not it could make an additional claim.  We find that opposer unduly delayed by waiting until April 11, 2006 to file its motion.

Accordingly, opposer's motion to amend the pleadings is denied.

**Findings of Fact**

The record shows that opposer sells, inter alia, outdoor products and power tools used by homeowners. Opposer began using the mark HEDGE HOG in 1995 for a hedge trimmer; began using GRASS HOG for a string trimmer and HEDGE HOG XB for a hedge trimmer with an extended blade in 1997; began using EDGE HOG for a lawn edger and LEAF HOG for a blower in 1999; and began using LAWN HOG for an electric

---

[8]  We acknowledge that the discovery responses did not specifically provide notice to opposer that, as opposer now contends, applicant did not have a bona fide intention to use the mark WATER HAWG on any of the identified goods.  However, we note that applicant did state, in its responses to opposer's document production request for "all documents relating to or [sic] Applicant's use or intent in connection with the mark WATER HAWG designation" that "no non-privileged documents are known to exist at this time."  Response to Request No. 2.

lawn mower and LOG HOG for an electric chainsaw in 2000. Opposer sells these goods at large home centers such as Lowe's and Home Depot, mass merchandiser stores such as Wal-Mart and K-mart, department stores such as Sears, hardware chain stores such as Tru Value and Ace, and "mom and pop" stores. Opposer's sales figures have been filed under seal, so we will not report them in this opinion; however, we will say that, for the period 1999-2004, those figures are substantial.

Opposer advertises its HOG-marked products through brochures, catalogs, signage and point-of-purchase displays, television, and the Internet. Opposer also provides press kits which result in newspapers and periodicals printing articles or editorials that discuss the efficacy of its products. In addition, retailers such as Home Depot advertise opposer's products on television, in print ads and through instore promotions. Opposer's advertising figures are also confidential, so we will not repeat them here.

Opposer is the owner of the following registrations:[9]

| MARK | GOODS |
|---|---|
| EDGE HOG<br>with EDGE disclaimed | Power operated lawn and gardens tools, namely, edgers[10] |

---

[9] Opposer also submitted a status and title copy of a registration for GOING HOG WILD, Registration No. 2347483. However, after the registration was made of record it was cancelled for failure to file a Section 8 affidavit, so no probative weight has been given to this registration.

| | |
|---|---|
| EDGE HOG<br><br>with EDGE disclaimed | Power operated lawn and gardens tools, namely, edgers[11] |
| GRASS HOG<br>with GRASS disclaimed | String trimmers, namely, power-operated grass trimmers[12] |
| GRASSHOG<br><br>with GRASS disclaimed | String trimmers, namely, power-operated grass trimmers[13] |
| HEDGE HOG | Power operated hedge trimmers[14] |
| HEDGE HOG 22<br>with 22 disclaimed | Power-operated hedge trimmers[15] |

[10] Registration No. 2385924, issued September 12, 2000; Section 8 & 15 affidavits accepted and acknowledged. The status and title copy was furnished by the USPTO on December 7, 2005, during opposer's testimony period and prior to the filing of the Section 8 and 15 affidavits. In accordance with Board policy, we have confirmed that Office records reflect the filing of these affidavits. See TBMP §704.03(b)(1)(A) (2d ed. rev. 2004) and cases cited at footnote 142.

[11] Registration No. 2391846, issued October 3, 2000; Section 8 & 15 affidavits accepted and acknowledged. The status and title copy was furnished by the USPTO on December 7, 2005, prior to the filing of the Section 8 and 15 affidavits. We have confirmed that Office records reflect the filing of these affidavits.

[12] Registration No. 2385919, issued September 12, 2000; Section 8 & 15 affidavits accepted and acknowledged. The status and title copy was furnished by the USPTO on December 7, 2005, prior to the filing of the Section 8 and 15 affidavits. We have confirmed that Office records reflect the filing of these affidavits.

[13] Registration No. 2200572, issued October 27, 1998; Section 8 & 15 affidavits accepted and acknowledged.

[14] Registration No. 1953766, issued January 30, 1996; Section 8 & 15 affidavits accepted and acknowledged; renewed. The status and title copy was furnished by the USPTO on December 8, 2005, prior to the renewal of the registration. We have confirmed that Office records reflect that the registration has been renewed.

[15] Registration No. 2485495, issued September 4, 2001

12

| | |
|---|---|
|  with 22 disclaimed; the stippling is a feature of the mark and does not indicate color | Power-operated hedge trimmers[16] |
|  with 22 disclaimed; the stippling is a feature of the mark and does not indicate color | Hedger[sic] trimmers[17] |
| | Power-operated hedge trimmer[18] |
| HEDGE HOG XB | Power operated hedge trimmer[19] |

---

[16] Registration No. 2423635, issued January 23, 2001. The status and title copy was furnished by the USPTO on December 7, 2005, prior to the time that Section 8 and 15 affidavits could be filed. Although these affidavits could have been filed as of January 23, 2006, current Office records do not reflect their filing. However, because there is a six-month grace period, to July 23, 2007, to file the Section 8 affidavit, the registration is still valid and subsisting.

[17] Registration No. 2388111, issued September 19, 2000. The status and title copy was furnished by the USPTO on December 7, 2005, prior to the time that Section 8 and 15 affidavits had to be filed. Current Office records do not reflect their filing. However, because there is a six-month grace period, to March 19, 2007, to file the Section 8 affidavit, the registration is still valid and subsisting.

[18] Registration No. 1981685, issued June 18, 1996; Section 8 & 15 affidavits accepted and acknowledged; renewed.

[19] Registration No. 2396416, issued October 17, 2000. The status and title copy was furnished by the USPTO on December 8, 2005, prior to the time that Section 8 and 15 affidavits had to be

| | |
|---|---|
| HOG POWER | Power operated lawn and garden edgers, string trimmers, electric mulching mowers, blower vacuums and sprayers[20] |
| | Power operated edgers, string trimmers, hedge trimmers, electric mulching mowers, blower vacuums and sprayers[21] |
| IS THERE A HOG IN YOUR YARD? | Power operated garden tools, namely, edgers, trimmers, lawn mowers, blowers and grass shears[22] |
| LAWN HOG<br>with LAWN disclaimed | Electric lawn mower[23] |
| <br><br>with LAWN and ELECTRIC MULCHING MOWER disclaimed | Electric lawn mower[24] |
| | |

filed.  Current Office records do not reflect their filing. However, because there is a six-month grace period, to April 17, 2007, to file the Section 8 affidavit, the registration is still valid and subsisting.

[20]  Registration No. 2666660, issued December 24, 2002.
[21]  Registration No. 2674692, issued January 14, 2003.
[22]  Registration No. 2652753, issued November 19, 2002.
[23]  Registration No. 2696240, issued March 11, 2003.
[24]  Registration No. 2696241, issued March 11, 2003.

| | |
|---|---|
| LEAF HOG<br>with LEAF disclaimed | Power-operated lawn and garden equipment for residential maintenance, namely, lawn vacuums, blower-vacuums, leaf and grass blowers; power blowers for lawn debris, vacuums and replacement parts thereof for leave [sic] and other debris[25] |
| LOG HOG<br>with LOG disclaimed | Power-operated tools, namely, chainsaws[26] |

Applicant manufactures, through its Emerson Tool Company division, wet/dry vacuum cleaners and humidifiers. It does not sell any lawn and garden equipment. It sells its wet/dry vacuum cleaners under various marks, including the RIDGID brand, which it makes for Home Depot, and the CRAFTSMAN brand, which it makes for Sears. Applicant has not yet used the mark WATER HAWG. It made some sales in the United States of wet/dry vacuum cleaners under the mark DIRT HAWG to a chain of automotive stores in 2004, although at the present time applicant's DIRT HAWG wet/dry vacuum cleaner is sold only in Costco in Canada.

Applicant adopted the trademarks DIRT HAWG and WATER HAWG for its proposed products in tribute to the Arkansas Razorbacks, the division's vice president being an alumnus

---

[25] Registration No. 2693688, issued March 4, 2003.

of that school.  Its vice president was aware of opposer's HOG marks at the time it chose the DIRT HAWG and WATER HAWG marks.

**Standing**

Opposer's evidence of its HOG registrations and of its use of various marks containing the word HOG shows that opposer is not a mere intermeddler.  Therefore, opposer has established its standing.  Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

**Priority**

Because opposer's pleaded registrations are of record, priority is not in issue.  King Candy Company v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).  Moreover, the evidence shows that opposer began using many of its HOG marks, including HEDGE HOG, EDGE HOG, LEAF HOG, GRASS HOG and LAWN HOG, prior to the filing date of applicant's intent-to-use applications in 2002, which are the earliest dates on which applicant can rely.[27]

**Likelihood of Confusion**

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative

---

[26]  Registration No. 2452614, issued May 22, 2001.

16

facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., <u>supra</u>. See also, In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

We turn first to the <u>du Pont</u> factor of the similarity of the marks. Opposer claims a family of marks based on the surname HOG.[28]

> A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner. Simply using a series of similar marks does not of itself establish the existence of a family. There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods.

J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991).

Recognition of the family is achieved when the pattern of usage of the common element is sufficient to be indicative of the origin of the family. <u>Id</u>. In the present

---

[27] As noted above, applicant did not begin using the DIRT HAWG mark until 2004, and it has not yet begun using the mark WATER HAWG.

[28] Although opposer pleaded likelihood of confusion with respect to its individual marks as well as its family, its brief discusses likelihood of confusion only with respect to its family of marks, and we will therefore do the same. In addition, in its reply brief opposer asserts that it has common law rights in HOG per se. Opposer never pleaded this, nor was the issue of likelihood of confusion with respect to HOG per se tried by the

case, the evidence is very clear that opposer has created a family of marks consisting of the word HOG, preceded by a word that indicates or suggests the use of the product for which it is used, such that consumers will view marks following this pattern as having a common origin. Opposer advertises and promotes several of its "HOG" marks together. For example, applicant shows multiple products, bearing various HOG marks, in print advertisements (e.g., Newland ex. 96, inside cover of ACE "homeplace" magazine headed "Hog Powered Products" and featuring the marks GRASS HOG, LAWN HOG, HEDGE HOG and EDGE HOG), store take-away cards (e.g., Newland, ex. 4 showing HEDGE HOG XB and LOG HOG) and product brochures (e.g., Newland, ex. 24 showing LAWN HOG, HEDGE HOG, EDGE HOG, GRASS HOG and HOG POWER). The different HOG products are placed together in stores, including in end of aisle displays (e.g., Newland ex. 79, showing HEDGE HOG and GRASS HOG products). Moreover, the HOG element is emphasized in these stores by banners with slogans such as GOING HOG WILD, HOG POWER and HOG POWERED PRODUCTS. In addition, opposer sends out a "strike force" consisting of 25-30 bright orange Suburban vehicles displaying several of its HOG marks. These crews drive throughout the country and do product demonstrations in tents they set up in front of stores such as Home Depot. The various HOG products are

---

parties. Accordingly, we have given this contention no

displayed in these tents, along with signage that features all the HOG brands that opposer sells at that particular time.  Opposer's press kits include information on its several HOG products, and this publicity effort has resulted in periodicals listing several of the HOG brands in the articles or editorials.  See, for example, the May 2002 "Detroit News" article listing the marks HEDGE HOG, LEAF HOG and EDGE HOG (Newland, ex. 43).  Some of the printed materials literally tell consumers that opposer has a HOG family of marks: A Home Depot advertisement has the caption "Black & Decker Hog Family" (Newland ex. 91) and an article in "USA Today" in July 2001 has the subhead "What Hogs!" and begins, "A family of hogs on the loose in your yard doesn't sound especially appealing, but you'll be awfully glad they're around once they get busy landscaping your property. The hog family we're speaking of is Black & Decker's line of lawn and garden products, especially the Edge Hog and Lawn Hog." (Newland ex. 48).

We are persuaded by the evidence of record that opposer has established a family of marks based on the common element HOG.  Applicant does not seriously dispute this; in fact, at page 21 of its brief applicant refers to opposer's "HOG family of marks."

---

consideration.

In comparing opposer's marks with applicant's marks, then, the question is not whether each of applicant's marks is similar to opposer's individual marks, but whether applicant's marks would be likely to be viewed as members of opposer's HOG family of marks. In this respect, the pattern that applicant's marks follow, i.e., the word HAWG, preceded by a term that describes or suggests a characteristic or function of the product, is the same pattern that is used by opposer's family of marks. However, as applicant points out, the term in applicant's mark is spelled "HAWG," and the term in opposer's marks is spelled "HOG." It is applicant's position that this difference in spelling distinguishes applicant's marks from opposer's family, and that "based on appearance, sound and connotation, consumers would view HAWG as something completely different than and unrelated to HOG." Brief, p. 12.

We are not persuaded by applicant's arguments. The dictionary definitions made of record by opposer show that "hawg" is defined as "hog." See, for example, the definition in Random House Webster's Unabridged Dictionary, 2d. ed. © 1998. This same dictionary shows that the words may be pronounced the same way. Even applicant's witness testified that "HAWG" is slang for "HOG," (Beth dep., p. 78), that "hog" can be spelled as "HOG" and "HAWG," (id.) and that, in terms of how people pronounce the words, "it

would be hard to distinguish the difference in a lot of cases." Id. As for the appearance of the words, although "HAWG" contains an "AW" and "HOG" contains an "O", they both begin with an "H" and end with a "G." Under actual marketing conditions, consumers do not necessarily have the luxury of making side-by-side comparisons between marks, and must rely upon their imperfect recollections. Dassler KG v. Roller Derby Skate Corporation, 206 USPQ 255 (TTAB 1980). As a result, the slight difference in the middle letters is not sufficient to distinguish the marks in appearance, particularly because the marks are identical in pronunciation and connotation and commercial impression. That is, the similarities in the marks are so overwhelming that consumers are likely to misremember how HOG is spelled in opposer's family of marks and, on encountering the mark DIRT HAWG or WATER HAWG used on related goods, would think that these marks are part of opposer's family. Moreover, consumers who have only heard of opposer's family of marks, such as through word-of-mouth recommendations, would not be aware of this difference in spelling at all.

Applicant has argued that, as actually used in commerce, the packaging for opposer's products includes, in addition to a HOG mark, a design of a hog's head (shown in some of opposer's registered marks, as set forth supra), opposer's house mark, BLACK & DECKER, and an "identifiable"

21

color. Brief, p. 12. It is apparently applicant's position that these additional elements distinguish opposer's products from applicant's marks, "which are strictly word marks and do not contain any picture elements." Brief, p. 13.[29] We are not persuaded by this argument. Opposer has demonstrated a family of HOG marks separate and apart from the design of a hog's head, the trademark BLACK & DECKER, and the color of its packaging, and therefore it is appropriate for us to consider the issue of likelihood of confusion with respect to this family of marks. Opposer also owns numerous registrations for its HOG marks in standard character form, and therefore has the right to use the marks without additional marks or a particular trade dress.

The factor of the similarity of the marks favors a finding of likelihood of confusion.

The next du Pont factor we consider is that of the relatedness of the goods. Applicant points out that its wet/dry vacuums are specifically different from the various goods opposer sells under its family of HOG marks.[30]

---

[29] We find it interesting that applicant relies on additional elements used on opposer's packaging, but in response to opposer's assertion that applicant also uses a hog's head in connection with its product, applicant claims that the Board must consider only the word marks DIRT HAWG and WATER HAWG, which are the marks for which application has been made.

[30] Although the identification of goods in the applications is for "vacuum cleaners, wet and dry vacuum cleaners, and replacement parts therefor," applicant has limited its comments to wet and dry vacuums (also referred to as wet/dry vacuums).

However, it is well established that the goods of the applicant and registrant need not be similar or competitive, or even move in the same channels of trade, to support a holding of likelihood of confusion.  It is sufficient that the respective goods are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same producer.  See In re International Telephone & Telegraph Corp., 197 USPQ 910 (TTAB 1978).

Although opposer does not sell wet/dry vacuum cleaners under a HOG mark, the record shows that opposer does sell such goods.  Thus, products sold under the various HOG marks and wet/dry vacuum cleaners can and do emanate from a single source.  Further, although the goods sold under opposer's HOG family of marks may generally be categorized as lawn and garden products, a wet/dry vacuum cleaner can be used to clean sidewalks, decks and patios.  Beth dep. p. 85, Newland Ex. 99.  Both opposer's HOG-marked goods and applicant's

---

Because we consider these goods to be closer to opposer's goods than vacuum cleaners in general, we have confined our analysis to these goods.  See Tuxedo Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) (likelihood of confusion must be found if there is likely to be confusion with respect to any item that comes within the identification of goods in the application).

goods may be stored in a garage. "The majority [of HOG products] would probably be in a garage." Newland dep. p. 125; "Garages, basement and workshops. Ninety percent of them [wet/dry vacuums] are in those areas." Beth dep. p. 137). Moreover, opposer's LEAF HOG leaf blower and a wet/dry vacuum cleaner have characteristics or functions in common. Wet/dry vacuums often have a blowing feature that can be used to blow leaves, just as a leaf blower can. In fact, opposer's wet and dry vacuum with portable blower (sold under the Black & Decker trademark) is advertised as being used for "leaf and grass removal on hard surfaces" and to "blow decks and patio's [sic] clean." Newland ex. 99. In addition, an Internet promotion for the Ridgid wet/dry vacuum with detachable blower (a product that applicant makes as a private label brand for Home Depot) touts the product as being a substitute for a leaf blower: "Why Own a Separate Leaf Blower? Our Detachable Hand Held Blower Performance Meets or Exceeds that of Dedicated Lawn & Garden Leaf Blowers!!"

Applicant has gone into some detail in explaining the differences between a leaf blower and a wet/dry vacuum, specifically that these products operate differently, and that a leaf blower cannot generally do the same types of things that a wet/dry vacuum can do. We recognize that there are specific differences between a leaf blower and a

wet/dry vacuum, as well as differences between opposer's other lawn and garden products sold under the HOG family of marks.  However, as we stated previously, it is not necessary that the goods be identical in order to find a likelihood of confusion.  Thus, the fact that "opposer has presented no survey evidence or any documentary evidence that would show that ultimate consumers view such wet/dry vacuums to be the same product as or in competition with dedicated leaf blowers," applicant's brief, p. 16, is of no moment.  The question is not whether consumers would mistake the goods, but mistake the source of the goods.

Applicant's wet/dry vacuums are related to opposer's line of lawn and garden products, in that they may be used by the same do-it-yourself consumers for maintenance and clean-up.  The fact that opposer has a family of HOG marks, and uses these marks on a range of products, increases the likelihood that consumers will view a wet/dry vacuum sold under a similar mark as being an addition to opposer's group of products.  This is particularly likely because of the similarity in function or purpose of a leaf blower and a wet/dry vacuum, and the fact that opposer sells wet/dry vacuums (under a different mark), thus showing that both wet/dry vacuums and lawn and garden products can emanate from a single source.  As a result, consumers are likely to believe, upon seeing wet/dry vacuums bearing marks that

appear to be part of opposer's family of HOG marks, that opposer has expanded its line of HOG products.

The factor of the relatedness of the goods favors opposer.

With respect to the channels of trade, both wet/dry vacuums and the products for which opposer uses its HOG-trademarks can be found in the same stores. In fact, applicant sells wet/dry vacuum cleaners (albeit under trademarks other than the ones at issue) at Home Depot, Sears and small hardware chains, and applicant further states that its goods can be sold through mass merchandisers such as Wal-Mart. Brief, p. 17. These are the same stores in which opposer sells its goods.

Applicant argues that, despite the fact that the parties' goods can be sold through the same channels of trade, this factor should not favor opposer because the goods are not sold in the same sections of the stores. The evidence shows that, at least for large home centers, the store buyers who handle power tools traditionally purchase the store's wet/dry vacuums, while the products for which opposer's HOG marks are used are purchased by the stores' garden equipment buyers. It is presumably for this reason that the goods are displayed in separate areas.

We point out, first of all, that large stores such as Home Depot and Wal-Mart are not the only stores that can

sell wet/dry vacuums and lawn and garden equipment. These products can also be sold in smaller hardware stores, including mom-and-pop stores. In such stores, there may not be separate buyers for the equipment, or because of the size of the stores, the goods may be sold together or in close proximity. Opposer's witness testified that he has seen wet/dry vacuums sold near opposer's HOG products in retail stores that he has visited as part of his business duties.[31] Even if we assume that the respective goods are sold in different areas of large home center stores, the areas may still be relatively close; applicant's witness testified that at a Home Depot store he visited, they were six-to-eight aisles apart, while at a Wal-Mart store they were four aisles apart. More importantly, the goods have some functions in common, in that wet/dry vacuums such as applicant's can be used for cleaning outdoor areas and for leaf blowing, and opposer's goods are used in outdoor areas, e.g., the EDGE HOG edger is used for areas around sidewalks and patios, and the LEAF HOG blower is used for leaf blowing; as a result, a consumer may encounter both types of products during a visit to a particular store, regardless of their location within the store.[32]

---

[31] Newland dep., p. 135-36.
[32] Applicant has submitted pages from various retailers' websites that show that products such as opposer's are classified under the categories "lawn and garden" or "outdoor equipment," while wet/dry vacuums are classified under such categories as "power

Accordingly, we find that the factor of the channels of trade favors a finding of likelihood of confusion.

With respect to the conditions under which the parties' goods are purchased, both goods are sold to do-it-yourselfers who are home owners and have yards to maintain. These customers are the public at large, and they have not been shown to have any particular sophistication or expertise with respect to these products. Further, the products are relatively inexpensive; applicant's two-gallon wet/dry vacuum costs between $19 and $24, while its sixteen-gallon vacuum costs $100. Opposer's products range from $49 for a GRASSHOG string trimmer to $69 for a LEAFHOG blower to $119-248 for the LAWNHOG mowers.

The purchase of these products is not likely to engender a great deal of deliberation. In fact, the two-gallon wet/dry vacuum might well be purchased on impulse. Thus, no more than ordinary care is likely to go into the

---

tools" or "home." First, it is not necessary that goods are sold in all of the same channels of trade for this du Pont factor to favor a finding of likelihood of confusion. Second, the website evidence shows that both types of products—opposer's and applicant's—are sold through the same websites, so they are in the same channels of trade. And third, in some of the websites both types of goods may be found by following the same chain of links, although the ultimate page on which the respective products are found may be different. See, for example, Beth dep. Ex 33, showing the Wal-Mart website. On that website, one way to reach wet/dry vacuums is to go through the categories "Garden and Patio," then "Lawn & Garden Equipment" to reach "Wet/Dry & Shop Vacuums." Opposer's LEAF HOG blower and vacuum is found through the same route of "Garden and Patio" and "Lawn & Garden Equipment", with the final subcategory being "Blowers."

decision to purchase these products, and this du Pont factor favors opposer.

The next du Pont factor is that of fame of opposer's family of HOG marks. Because the information regarding sales and advertising has been submitted as confidential, we are hampered in our discussion of the evidence that is relevant to this factor. We thus will say only that, although opposer has enjoyed considerable success with its sales of products bearing its HOG-family marks, we cannot find, based on this evidence, that opposer's HOG family is famous. Nor has opposer argued that its marks are famous. At most, we find that opposer's HOG family of marks is strong.[33]

Despite the strength of opposer's family of HOG marks, applicant argues that there are a large number of third parties who use HOG marks, and therefore opposer's mark is

---

[33] Applicant has asserted that opposer's advertising expenditures for its HOG marks must be apportioned between promotion of the house mark BLACK & DECKER that appears on the packaging for the products and the HOG marks themselves, and also argues that there is no evidence that the HOG marks have gained fame independent of the house mark. With respect to the first point, applicant has pointed to no case law, and we are not aware of any, that requires that advertising expenditures be apportioned among the various marks that appear in the advertising. As for applicant's second point, although, as noted above, we find that opposer's HOG marks are not famous, the evidence of opposer's sales and advertising, as adduced through the testimony and accompanying exhibits of Joseph Newland, is sufficient to prove that the family of marks is strong. In fact, it is because of the advertising promoting the HOG family of marks, and the manner in which the marks are used on the products and the products are displayed in stores, that the HOG family feature makes a strong commercial impression.

entitled to a more limited scope of protection.  We note that much of applicant's evidence consists of search results that were obtained from USPTO records, and consist only of lists of third-party applications and registrations for marks that contain HOG or HAWG, including some marks that do not contain these words as separate elements, but only letter strings, e.g., ORTHOGLIDE.  Submitting lists of third-party registrations and applications is not an acceptable way to make such registrations and applications of record.  In re Duofold Inc., 184 USPQ 638 (TTAB 1974).  Moreover, even copies of third-party applications have no evidentiary value other than to show that the applications were filed.  Although third-party registrations may be used in the same manner as dictionary definitions, to show that a term has a significance for goods in a particular field, see Mead Johnson & Company v. Peter Eckes, 195 USPQ 187 (TTAB 1977), mere lists do not show what the particular goods are for which the marks have been registered.  Thus, the search results submitted by applicant have no probative value.

Applicant has, however, submitted copies of certain third-party registrations that were obtained from the USPTO's TESS database.  These registrations are for BUSH HOG and design for power operated agricultural implements and machines, including rotary cutters, mowers, landscape, golf

30

course and garden mowers, tillers, plows and grain augers,[34] BUSH-HOG for rotary cutters for cutting stalks, stumps, stubble and the like,[35] BUSH-HOG for light utility vehicles[36] and TURF HOG for agricultural implements and machines, namely mowers and cutters, all of which appear to have been registered by the same company;[37] FLOOR HOG for brooms and squeegees;[38] RAZOR-BACK HOG for scraping and chopping hand tools, including ice scrapers, sidewalk scrapers, garden scrapers and grass trimmers;[39] HOG WASH for all-purpose cleaning and degreasing preparations for automotive, interior auto, household, marine and outdoor use, including concrete, lawn mowers and patio areas;[40] SAND HOG for sand measuring and dispensing tool for industrial and construction purposes;[41] MUD HOG for concrete mixers;[42] GROUND HOG for digging equipment, namely, trenching machines and earth drilling machines;[43] and SKID HAWG for power-operated agricultural implement, namely, a rotary cutter for cutting and mulching.[44]

---

[34]   Registration No. 2351128.
[35]   Registration No. 595490.
[36]   Registration NO. 2944280.
[37]   Registration No. 1524174.
[38]   Registration No. 2993362.
[39]   Registration No. 2460075.
[40]   Registration No. 2837842.
[41]   Registration No. 2874792.
[42]   Registration No. 2607460.
[43]   Registration No. 2353108.
[44]   Registration No. 2642451.

We cannot conclude from these registrations that HOG or HAWG has a particular significance for goods of the nature of opposer's or applicant's products.  We note that the marks RAZOR-BACK HOG, HOG WASH and SKID HAWG have a very different pattern and significance than do opposer's and applicant's marks, with RAZOR-BACK HOG referring only to the animal, while in HOG WASH the meaning of the word HOG alone is lost, and SKID in SKID HAWG does not appear to have any reference to a characteristic or property of the goods. The goods in the MUD HOG, GROUND HOG and BUSH-HOG for light utility vehicles registrations are so different from the goods at issue herein that they do not show that HOG has a significance for these products.  The marks in the remaining registrations, for BUSH HOG, TURF HOG and FLOOR HOG, do appear to have a similar formation, but three registrations (two of which are for variations of the same mark) issued to a single entity and an additional registration issued to another third party are not sufficient to show that HOG is a suggestive term for the goods at issue or that opposer's marks are entitled to a limited scope of protection.

In addition to the third-party registrations, applicant has also submitted what purports to be evidence of third-party use of HOG marks.  This evidence consists of web pages which applicant's witness obtained from Internet searches. The web pages include a listing of the specifications of the

32

BUSH HOG powered rotary cutter and the BUSH HOG finishing mowers, with an indication that for pricing and availability one should contact an authorized Bush Hog dealer (www.bushhog.com); a listing for the Hog™ Scraper/Chopper, noting that the products are available through distributors and retailers and providing a link and/or phone number for assistance in locating one (http://uniontools.com); a description of the POOL HOG in-ground automatic pool cleaner, including a way to order it (www.poolcenter.com); and the website for Landscaper Pro, from which one can order, inter alia, GRASS HAWG mulching blades for use on various brands of mowers.

Applicant's witness had not seen any of the foregoing products actually for sale in retail stores, nor could he testify as to whether one could buy the products shown on the websites.  Although the web pages provide some evidence that the marks are in use, we cannot determine to what extent the goods have been sold.  Based on this limited evidence, as well as the limited number of third-party uses, we cannot say that the public has been so exposed to third-party uses of HOG marks that they would look to other elements of these marks, in applicant's case, the words DIRT and WATER, in order to distinguish among the various HOG marks.  Simply put, the evidence that applicant has submitted with respect to third-party use of HOG marks does

not outweigh the significant amount of sales of opposer's HOG products and the expenditures by opposer in advertising and promoting its HOG family of marks.

The next two du Pont factors, evidence of actual confusion or length of time without evidence of confusion, are related. There is no evidence of instances of actual confusion. However, we do not consider this to be significant given that applicant has not used the mark WATER HAWG at all, and its sales of product under the mark DIRT HAWG have been very limited, with no sales in the United States at the present time. Accordingly, we treat both of these factors as neutral.

The only other du Pont factor on which we have evidence is that of the variety of goods on which opposer's mark is used. As noted, opposer has a family of HOG marks which it uses for a number of goods. As a result, consumers may well think, upon encountering WATER HAWG or DIRT HAWG for wet/dry vacuums, that opposer has expanded its line of HOG marks, particularly because of the similarities between a leaf blower, for which opposer uses the mark LEAF HOG, and a wet/dry vacuum.

Finally, with respect to whether applicant adopted its marks in good faith, we note that applicant was aware of opposer's prior use of its HOG marks. However, we find credible applicant's explanation that it chose DIRT HAWG and

34

WATER HAWG because of the association of the word HAWG with the University of Arkansas.  Thus, we have not based our decision herein in any degree on opposer's contention that applicant chose its marks in an attempt to trade on the reputation of opposer's marks.

After considering all of the relevant du Pont factors, we find that applicant's use of DIRT HAWG and WATER HAWG for "vacuum cleaners, wet and dry vacuum cleaners, and replacement parts therefor" is likely to cause confusion with opposer's family of HOG marks for its various products.

Decision:  The oppositions are sustained.